Our final case this morning is In Re Depomed, Ms. Chow. May it please the Court, Arlene Chow on behalf of Depomed. The Board made a series of legal errors which warrant reversal. First, the Board ignored the undisputed, unexpected results due to the PEO and HPMC combination in a gastric retentive and controlled release dosage form. What do you mean by that? Because if I understand the record correctly and what was argued, that you said the unexpected results were that it performed better than each of the two components individually. Am I correct about that? Yes. But didn't the prior art suggest that making a combination like that would achieve a better result than the ones individually? There is no such suggestion in the prior art. In Shell, there was no suggestion to even combine PEO and HPMC. HPMC and PEO individually, they provided adequate control release. That's what they were described as particularly preferred. They were on a short list for individual use, but not on a short list. Isn't it correct that they were described as particularly preferred? Yes, but for individual use, Your Honor. There is a general statement in Shell that the water-soluble polymers can be used individually or in combination, but it's important that that sentence is followed by the statement that certain combinations By the way, you haven't properly numbered the pages of the appendix, which makes it extremely difficult to work with. So the start of Shell, Your Honor, is at appendix 321. Do you understand what I'm saying about the number? Yes, I do. And so page 6 of Shell. So if you go to appendix 321, that's the first page of Shell, and then you go to Shell page 6. Wait, wait, wait. I'm having trouble dealing with this with the unnumbered pages. What page are you referring to? Page 6, Your Honor. Page 6 of Shell? Yes. Is that W09855? Indeed it is, Your Honor. So in the middle, in lines 21 through 23, there's specific controlled release criteria where it states the amount of polymer will be sufficient, however, to retain at least about 40% of the drug within the matrix one hour after ingestion. PEL and HPMC met that specific criteria. But doesn't the same page here say certain combinations will often provide a more controlled release of the drug than their components when used individually? Indeed. And those combinations, a person of ordinary skill in the art would understand, would be ones where the individual polymers were deficient. And indeed, xantham gum, which is noted as XG in the figures, and HEC, which is hydroxyethyl cellulose, those polymers individually were deficient. They did not meet the specific performance criteria that I just listed. And that is why they were in combination. And so such combinations that are called for and that a person of ordinary skill in the art would do in light of Shell are only ones where there is a deficient polymer in place. Now, in terms of Papa Demetrio. So in your position that's the only way to read that sentence? Is it saying there's only where they won't work alone? Would you combine the two of them? Well, a person of ordinary skill in the art would look at the data in order to give those sentences context. Certain combinations will work to improve, and those certain combinations were ones where a polymer was in aid of the deficient polymers, such as here, xantham gum and HEC. That is why the figures. What's your basis for that reading, your limited reading of the reference that way? A person of ordinary skill in the art would understand that there's no teaching of anything. How do I know that? Because none of the polymers. Where in the record? I mean, you stand here and you say that. Where is that in the record? In the record, Dr. Hoppenberg, our expert, explained how a person of ordinary skill in the art would interpret this data. And it's very clear that there are only combinations where there's a deficient polymer. Where does he say that that sentence would be viewed in the limited way that you do? I think what he said, he didn't say it specifically in the limited way. What he said was that there's no suggestion to combine HPMC and PEO in Shell. There is no suggestion whatsoever. And in so doing, he identified the specific performance criteria  which is why you do not see them in combinations only unless the other polymers are deficient. That's why there are only combinations involving XG and PEC, HEC. Also, and your honor, it's important to also stress that because of the legal errors where the undisputed, unexpected results and the unrebutted, long-felt, unmet need were not considered, that these references, both Shell and Papa Demetrio, they were viewed solely in hindsight. I mean, I think it's important to underscore the fact that that combination, the result was unpredictable. The synergy was unexpected. And in fact, if you look at the characteristics of each individual polymer, HPMC swells less than PEO. That means that it would have, if placed in the combination, one would have expected it to have worse gastric retention. But there's no testimony in the record about what was expected of the combination and how the combination exceeded the expectations of the combination. There's only testimony that exceeded the compounds individually. There is testimony that polymer combinations are inherently unpredictable. There is substantial testimony that there was unexpected results and long-felt unmet need. This patent is the difference. Can I please address my question? I do know there's testimony in there that this exceeded the results that would have been achieved by using one compound individually. Is there testimony that the combination exceeded what would have been expected of the combination? Yes, Your Honor. I think the patent itself has, sorry, short cut. If there's testimony as to whether or not the combination would have exceeded the expectation of the combination, the testimony is that polymer combinations are inherently unpredictable. There's no way to predict that. Answer my question. Is there testimony that the combination exceeded what one would expect of the combination? There is testimony, sorry, Your Honor, I am trying to answer your question because the testimony is that there would have been no expectations in relation to those combinations because polymers are inherently unpredictable. So to be clear, the unexpected results are due to the fact that the synergy is unexpected. It could have gone worse. It could have been the same. It could have been the same as the combination. The combination exceeded what one would have expected, but there is no expectation because fundamentally the polymers are unpredictable in combination. But the reference says specifically, doesn't it? It says here it gives a list of the polymers, and then it says the water-soluble polymers can be used individually or in combination. I mean, it sounds as if you're making almost a teaching away argument at this point, and I see the reference actually teaching. It says here are some polymers that you can use, and then it says they can be used individually or in combination. Yes, it gives some examples, but it just says those are examples. It doesn't say that they're limiting examples. I think a person with a moderate skill in the art would see the way how individual polymers were combined, and to be clear, the Shell reference doesn't teach the synergistic effect, which ties into the unrebutted, unexpected results of this invention and also the long-felt unmet need because the 340 patent, Your Honors, is the difference between having a once-a-day dosage form with less side effects versus the immediate release form that was already in the prior art. That difference is significant. It's significant because it materially impacted the quality of life of patients who are both diabetic and had post-herpetic neuralgia. This is a very significant difference. Only because of the PEO and HPMC combination in a controlled-release, gastric-release dosage form was that once-a-day dosage form allowed to occur. So to underscore the unpredictability of polymers, Your Honors, Shell. Shell stands for the unpredictability of polymer combinations. If you take Figure 6 of Shell, which is near the end, that HPMC and HEC did not improve the poor gastric retention of HEC alone, and yet PEO and HEC and HEC and xanthan gum did. So even Shell, when Shell was doing things in combination and using a so-called deficient polymer, there was no prediction of which ones would work, and indeed one of them failed. One out of three failed. So Shell itself stands for that unpredictability. What also stands for that unpredictability is a one-and-a-half year of what we would call undue experimentation by the inventors. Shell 1998 is DepoMet art. It is, albeit, by different inventors. And it's important to stress the fact that even with Shell in place and even with DepoMet being the market leader in controlled-release and gastric-retention dosage forms, it took them a year-and-a-half to invent the 340 patent. Typically, when we hear these cases, we see a real infinite number of possibilities that exist when we get an argument about undue experimentation. But here, Shell referenced only seven preferred polymers. What is it about that that makes it undue, that leads to undue experimentation? There was no indication, Your Honor, that HPMC and PEO together would work, let alone have that synergistic benefit where there was superior gastric-retention control. But your testing started out with those two polymers. Pardon? Your testing started out with those two polymers. Oh, no, Your Honor. Actually, the lab notebooks, because DepoMet did start with PEO, one month later there was a notational lab notebook that the inventors were considering HPMC. But it's not clear that it is in combination with PEO. In fact, the lab notebook, if anything, it could be indicating that HPMC is in lieu of or in place of PEO. So the lab notebook is that they were considering HPMC as one of many options, as an option, as an alternative to PEO. There is no indication that, A, they tested at that time and they didn't. But all that test that you have in the lab notebook is that it is a possible potential candidate. And that is why DepoMet tested dozens of formulations, Your Honor, dozens of formulations. And, in fact, because there was no predictability in this area, they also had to perform a lot of rigorous testing. They had to develop their own erosion and swelling assays because the standard assays at the time were not robust and predictable enough for what would occur in the body. And if I could just bring in Papa Demetrio briefly. And Papa Demetrio... I'm sorry, go ahead. I was just going to ask you, now that issue we were just talking about, the unexpected results, whether the board properly considered it, that's something we would view for substantial evidence. Is that right? No, no, that's de novo, Your Honor. That's a legal error that was subjected to review. But if they actually considered it. I mean, they have in their opinion that they've considered it. They just don't... It's not convincing to them to change their conclusion. Why is that not a factual issue? Your Honor, we submit that it's legal error and de novo because they discounted it in its entirety when it was unrebutted. Both the long-felt unmet need and the unexpected results were unrebutted. And ENDO did not dispute either of these two critical, critical objective considerations of non-obviousness. The board gave it absolutely no weight. I'd say they discounted it. They discredited it. They did not even take into account, which is why their assessment of Shell and Papa Demetrio is wholly out of hindsight bias. You're into your rebuttal time. Do you want to save it? Yes. Okay. Thank you. Ms. Caprahan. Thank you, Your Honors. May it please the Court. Demetrio's challenge claims here are directed to controlled release of a water-soluble drug combined with PEO and HPMC to provide gastric retention and controlled release. Now, using PEO and HPMC to provide gastric retention and controlled release was known in the art. The Shell reference disclosed that. The Shell reference disclosed, as Your Honors noted, that HPMC and PEO were particularly preferred for this purpose, for this very purpose. And Shell further disclosed that one could optimize the controlled release dissolution profile by combining polymers. Although Shell did not specifically disclose combining HPMC and PEO, because there were only a finite number of possibilities that were disclosed in Shell, the Board properly found that one of scale in the art had a reasonable expectation of success in combining those polymers and providing a controlled release tablet that swelled in the gastric environment and provided that dissolution profile. What is the government's position on the Board's statement that the patentee has to offer evidence that others tried and failed in order to demonstrate long-felt need? So in terms of demonstrating long-felt need, what the Board found here is that they didn't give much weight to that evidence because they did not present evidence of failure of others. So it is not that the evidence of failure of others is required. It is that because there was no evidence of failure of others, that evidence was not given much weight. And this is because that in this art, it was known that PEO and HPMC would provide this type of dissolution profile for water-soluble drugs. And so it is the Director's position that the failure of others is not required, but it is probative in determining whether or not there was a long-felt need here in this art. At what point were the objective indicia criteria considered? When I look at the Board's decision, it seems to me, and I'm looking at Appendix 34, it says that we hold the petition as not shown by a preponderance of evidence, and it goes on with its holding, and then it goes into secondary considerations. Is this a decision first on the augustness portion, and then you address after that objective indicia? Well, I think what the Board did was walk through first finding whether or not the art itself taught whether this type of formulation would be obvious. And then made its decision? The Court made that determination, but then the Court also considered the weight of the evidence. But it made the determination first, right? It made the determination first that there would have been a reasonable expectation of success, both either by Schell alone or Schell and Papadimitriou, for that one of skill in the art, would have been able to formulate these controlled-release products. But then the Board went on to look at the secondary considerations of non-obviousness that Dept of Med presented in its Patent and Merge response. Can you describe on Appendix 40 how they did that? So first the Board did look at... In the accordingly sentence? Excuse me? In the accordingly sentence on page 40? On page 40 the Board noted that they gave little weight to Patent and Merge's argument that evidence of alleged unexpected results overcame the petitioner's showing of obviousness in this case. And what the Board was doing there was giving little weight to the evidence that was presented. So did the Board first establish a decision as to petitioner's showing of obviousness before it considered the objective indication? Well, I think what the Board did is they looked at all of the evidence before them and because the evidence of unexpected results did not have proper weight, or they didn't give it weight, they found that it didn't overcome the obviousness determination that it found based on the prior arts of record. And because here the prior arts specifically taught that PEO and HPMC provide both gastric retention and controlled release, that it was obvious for one of Scale and the Art to formulate controlled release tablets using that formulation. And it's, I think, also instructive to look at the claims themselves. In the claims, DepoMed does not claim a specific dissolution profile for the combination of HPMC and PEO. All DepoMed claims is that combining a water-soluble drug with HPMC and PEO provides gastric retention and controlled release. And just one other thing I would like to know, are there any other questions? Just one. So, I guess what I'm getting at, and what I'd like for you to address, is whether the board adopted, like, a two-step process here with respect to the issue of obviousness and then looking at the objective indicion of non-obviousness. I mean, I think the board did do it in two steps. I think they first looked at the prior art of record and determined whether or not one of Scale and the Art would have had a reasonable expectation of success to perform the claimed invention. And then the board did look at the evidence that was presented by DepoMed and found that it simply did not have sufficient weight to overcome that finding that the board found with respect to the prior art. All right, thank you. Thank you. Okay, Ms. Chau, you've got a little over two minutes. Thank you. Your Honors, I would like to direct your attention, this is in relation to unexpected results, to page 39 of the board's final written decision. So pages 39 and pages 40, the heading is Undue Experimentation and Unexpected Results. What I'd like to stress is the fact that when you look at the paragraphs in this portion of the opinion, the first paragraph is dealing with undue experimentation, but there is no discussion of unexpected results. So there is no consideration whatsoever as to the evidence of unexpected results, which was submitted by DepoMed and is reported in the patent itself. It really truly is both unrebutted by ENDO, but is also not considered at all. And yet the undisputed unexpected results and the long-held unmet need here are compelling, as I said before, because that is a difference between a once-a-day dosage form with less side effects and greater compliance for both post-herpetic neuralgia patients as well as diabetic patients. These considerations were critical here. And we would direct Your Honors' attention to the Sanofi-Aventis case. This is 748F3, 1354. There, too, the difference between the result of the patent at issue was a once-a-day dosage form versus an immediate release dosage form in the prior art. Because of the combination that was unexpected in Sanofi-Aventis, what was ultimately achieved was a once-a-day hypertensive controlled dosage form with improved kidney and blood vessel function compared to the immediate release dosage form in the prior art. Your Honors, we submit that Sanofi-Aventis and here, this case here, that there are strong parallels. And that because of the legal errors by the board in relation to these objective considerations, that reversal is warranted here. Okay. Thank you, Ms. Chan. Thank both counsel. The case is submitted. That concludes our session for today.